Good morning. My name is Patricia Hubbard, and I'm going to address the first issue in the court's filing, the defendant's motion to dismiss the indictment for outrageous government conduct. Yes, and I hope you'll describe precisely what it is you feel is outrageous. Is it the setting up of a fake stash house? Is that outrageous, or is that a permissible kind of sting? Well, I don't... Excuse me. I know you're speaking generally, but who do you represent? I represent Kemford Alexander. Okay. And each of the other three issues are going to be addressed in order by the respective counsel, and we're each going to reserve five minutes. I think what we're looking at here is it's not that every fictitious stash house scenario could, would be improper. Okay. So it's not that it's fictitious. What is it about this particular sting that your view is outrageous? Well, one of the things is that the most overarching factor is that without the government, without the government's involvement, without the government's continued involvement, it was all essential and totally enmeshed with this fictitious enterprise. If I could back up just... I don't understand what that means. The government sets up a scenario, like an artificial lure when you fish, okay? There's a stash house. Help me rob it, okay? Now, if the defendants then say, oh, great, that's a fantastic idea, and here's how we're going to do it, there'll be this many of us, and we've got these arms, and so on and so forth, what is it about the government's continued involvement that matters? What matters here is that the government dictated the parameters of what was going to happen. How? Basically, every time... I mean, in this car video, the Jamaican, I'm forgetting people's names, Simpson, is that right, says, well, do I just need to bring my exploitive deleted girlfriend, or do I need to bring other people? And the response was always, it's your gig, you decide. That's correct, Your Honor. That's exactly what the government agent said. Which is to say... But he said more. Not my problem. But he said more than that. He always said that because he knows, presumably, about the problem of outrageous government conduct. Right. And so he avoids it. I mean, that's the other way to look at it is he knows that he can't, if he dictates the terms, if he says bring five people and bring an AK-47 and do this and do that, then he's stuck. But he never says any of that. He says enough, Your Honor. What's the enough? What specifically? For example, he says the stash house is going to be armed. There are going to be two armed men there. But that's part of just setting the scene. Did he actually say that? He said there are two guys there, right? Yes, he did. He said they would be armed. He said they would be armed. He said they would be armed. And so what he's setting up is a scenario. He's not just setting up the ripoff of a fictitious stash house. What he's setting, he's setting parameters, all of the parameters. He made it during the daytime by saying he had to get this call, phone call, and he was going to get it about noon, and then everybody was going to go there. He made it. What's that got to do with anything? Because at night, perhaps you wouldn't feel that you needed as many people. Certainly you're more vulnerable during the daytime. He said the parameter of the stash house would be armed with people, with more than one person with weapons. How is that different than what everybody would assume about a stash house and drug dealers? I mean, the ---- Your Honor, I don't know what people assume about stash houses. I really don't. But this case is much more like the Green case in this circuit than it is like, say, the Williams case. In the Williams case, which the district court cited as saying the Ninth Circuit recently explicitly approved of sting operations, plural, that's not what happened in the Williams case, which the district court is relying on on page 21 and 22. What the district ---- what this Court approved in Williams was a fictitious stash house robbery, the one that occurred in the Williams case. These are very fact-intensive analysis. And so it's really, respectfully to the district court, it's unfair to say that in Williams, this Court gave carte blanche to all fictitious stash house situations, because it didn't. It did only the one in Williams. Counsel, you have used your five minutes on this issue. And your co-counsel can continue the same issue or give you time. But we're ---- it's up to the four of you to decide how you want to do that. Well, we'll stick with the plan for now, Your Honor. Okay. Thank you, Your Honors. Florence Brummer. I represent Terrence Timmons. The issue that I'm going to be discussing is Timmons' motion to sever from the trial of the other defendants. As the Court recalls, Holden made the same motion. Holden was the defendant who was ultimately acquitted by motion after the trial. The argument that was made at trial was that there was no evidence that Timmons was present at any meetings with the government agents and the defendants. This was not including Holden, who ended up being acquitted, but the other defendants. Counsel, why wasn't this issue waived since it wasn't renewed at the close of evidence? Yes, Your Honor. Because of the Zaffaro case where there was two requirements where you can get past the waiver issue, one is whether Timmons diligently pursued it or if it would be an unnecessary formality. In this case, Timmons reaches on both. He diligently pursued it because this was done by a written motion. This just wasn't a severance where he said, hey, you know, I want to be severed from the other defendants, here's why. There was a written motion. There was a lengthy oral argument hearing where the Court made findings, asked questions. So it was diligently pursued. After that hearing, the Court still denied it. It was also an unnecessary formality because the district court on its own said that if the court recalls the order of acquittal regarding Holden. That's okay. I don't want to use up all your time. You've hit the ground. All right. Thank you very much. So regarding the prejudice, in this case, getting back to the requirements under Rule 14, that what needs to be met for the court to sever. It has to be so manifestly prejudicial that separate trial is the only proper exercise of discretion. And also if there's specific rights compromised or that the jury will be prevented from making a reliable judgment about guilt. In this case, Timmons had specifically argued the Sullivan case, and that was a case where there was a money laundering case. Timmons was concerned that the jury would jump from the other statements made by the defendants at these different hearings and say, well, Timmons is aware of the conspiracy because of these other statements these other defendants made when Timmons was not present. In the prejudicial effect to the jury, in the Sullivan case, the court says that the best way to measure it is if the jury, if you can tell if the jury can compartmentalize the evidence against the defendants. In the Decode case, you actually had evidence of that because the jury reached different verdicts. Some defendants were found guilty of some things, some acquitted on others. In this case, it was blanket in the case before us. Everyone was found guilty of everything. Well, he was present at the July 27 meeting where Alexander went around and signed the rules, didn't he? That's in dispute, Your Honor. That was only said by Simpson at the trial. Simpson never said it before, even though he had said that he had met Timmons at jail and that Timmons made him write that letter saying Timmons was innocent. And then suddenly at trial, Simpson says, oh, yeah, Timmons was there even though I just saw him today, I recognize him, which wasn't logical, going back to the district court's language about how she found Simpson's testimony, was it was not logical because Simpson also said that he was forced to write that letter by Timmons saying that he had met him before. He had the guns in his car? He did have the guns in his car. Yes. They were in a spot where they were not open in evidence. That was determined by the agent. They were hidden in a compartment. There was no fingerprints, and they were, could not be known to him. But his driving the green car was consistent with Simpson's testimony that at the assignment meeting he had been assigned to be one of the two drivers, correct? Well, he was identified by Black as being the driver, but it was just a generic he's the driver. So the one thing that was never demonstrated was he just driving to the storage unit, which is actually what happened, because that's when the arrest got placed. We never were able to determine if he was going to drive to the stash house, and that was one of the concerns that the district court judge had about Holden when acquitting Holden. Thank you, counsel. You have ten seconds. All right. Thank you. I just have one question. You mentioned that he was prejudiced by other statements. What statements were prejudicial to him? There were the statements that were prejudicial to him was all the planning that was done beforehand that he wasn't part of. That gets lumped onto him, even though he's not there and not part of it. And that's what I'm discussing.  Thank you. Good morning, Your Honor. Donald McPherson on behalf of Mr. Mahon. I'm also arguing on behalf of Mr. Timmons. With respect to the Court's inquiry, was there sufficient evidence that Timmons was a participant in the conspiracy rather than merely present at conspiracy activities? The Court's already made some inquiries as to the evidence against Timmons. I'll elaborate a little further. First of all, Simpson, I'm not going to go down that trail of reasonable inferences. That's for the jury. But I'm going to go down the path that Judge Murgia went down in acquitting, under Rule 29, Holden and finding that Simpson cannot be followed logically. There's no logical reasoning behind what Simpson testifies as to Holden. Likewise, as to Timmons, because as to Timmons, repeatedly at least three times prior to his testimony at trial, he says Timmons was not there. He never mentions Timmons being at any of these meetings. Yet at trial for the first time, he so mentions it. So it's just a simple straight-line logic, A plus B equals C. And if A and B are zero, then C has to be zero. The weapons were in the car, the other counsel. And I'm going to get to that. Okay. And that seems to me to be that and the sort of Pinkerton liability question seem to be difficult for your client to overcome. Well, as to the car, first of all, at page, I think it's 20 in my brief, 23, I've outlined, charted out for the Court, ten different cases in which this Court ordered acquittal. In many of those cases, the defendant was the driver of an automobile. He even knew in some of those cases, he even knew there were drugs in the automobile and he was driving it.  And if the defendant was acting in fullness of the conspiracy or actually participating, so you can be a driver of an automobile, know that there's drugs in the car and this Court is not. And also, but if the testimony that he was present at one of the at least one of these meetings where the roles were assigned and weapons were discussed, that I don't know of any case which says that that kind of evidence added into the mix will yield insufficient evidence. Well, there are cases that I've charted out for the Court where there's far greater evidence against those defendants which this Court acquitted than there was against Timmons or Mahon. And as to the driving of the automobile, this is a brief conversation when he first meets Zayas, and Zayas, yes, makes the comment, there's 50 keys, 50 kilos of cocaine over there, and we have two words from Timmons. Yeah, man. We don't have any discussion between Zayas and Timmons. Do you understand what we're about to do, brother? Do you understand we're going to the stash house. First, I'm going to show you. So a talkative, really talkative defendant in the exact same position, there's, I guess I don't understand why any words need to be spoken if they're understood what's going on. Because there's not evidence, clear evidence that he was at the other meetings. It's only symptoms that says he was at those meetings. And so we take this. And the jury is entitled to believe him. If it's logical. The inference that the jury concludes must be logical. It can't just be bare bones inferences. And so I'm suggesting that Simpson, his flow of testimony is illogical. And I'd like to move on to Mahon with limited time here. Mahon, I think, is in even a better situation because he never says a single word. Yes, he's at meetings, but he doesn't say a single word. Zayas says he nods. I invite the Court to review the video, which is only about three minutes long. It's Exhibit Government's Exhibit 5. In that video, you will see Mahon, and I'm going to do a little imitation here. He's bobbing his head very slightly throughout the conversation. This is where they're outside the car talking? This is, yes. This is the McDonald's parking lot scene. And throughout the conversation, that's his style. Toward the end of the conversation, you'll see him pull back, look disinterested and actually look away. Zayas says he nodded. There's no perceptible definitive nod, i.e., where Zayas never says, hey, Mahon, bro. He was at three meetings, right? I'm sorry? Three meetings. He was present at three meetings. He was present at three meetings, but Simpson never says anything definitive as to what he understood. He says they were all looked happy. It was a party. But back to the video, there's no conversation. There's no Zayas saying, hey, Mahon, you win with us on this, bro. And Mahon does a definitive nod. There's no such nod as that. So if you review the video ---- So your position is that if you sit quietly through a whole bunch of meetings conspiring at which other people are actively conspiring to go rob somebody and they go along with it, that they must, as a matter of law, be acquitted because they haven't said anything or nodded perceptibly? If they don't say anything or they ---- the key is, did they participate? Right. Did they demonstrate that they joined the conspiracy or they just hang around or ---- The presence at three meetings wouldn't demonstrate that in your view. As a matter of law, that's your position. As a matter of law, time and again, this Court has held you have to have more than mere presence. Mahon had nothing more than mere presence. He was at some meetings. He was present. Nothing more. Thank you, counsel. Thank you, Your Honor. Okay. Number four. Ms. Hovland, by process of elimination. Good morning, Your Honors. May it please the Court. I'm Tara Hovland. I represent Mr. Black. I will be addressing the issue of sentencing entrapment in regard to Mr. Black, Mr. Mahon, and Mr. Timmons. I would like to reserve one minute for rebuttal. The defense of sentencing entrapment serves to present the government, prevent the government from structuring sting operations in such a way as to maximize the sentences imposed on defendants without regard for the defendant's culpability or ability to commit the crime on his own. Although sentencing entrapment has been recognized by this Court since the mid-'90s, it has very rarely been analyzed within the framework of fictitious stash house robberies. The first time was in United States v. Briggs, where this Court expressed its concern about these types of cases because of the government's unfettered ability to inflate the amount of drugs, the types of drugs, minimize the obstacles, and obtain a greater sentence. Although sentencing entrapment's roots are in the pretrial phase claims of outrageous government conduct and entrapment, the analysis of sentencing entrapment is distinct from those claims and should not be erroneously entangled with them. This is unfortunately what the district court did in this case. In assessing the sentencing entrapment request, the district court abused its discretion in two significant ways. One is it required the defendants to prove that they were predisposed to steal less than 23 kilos of cocaine. And two, they based the predisposition element on the five factors in McClellan. Both of those were wrong for the following reasons. One, the McClellan court itself said that those five factors were the test for predisposition element in the defense of legal entrapment that you do during trial, not for sentencing entrapment. And the court goes on to explain why, when the government was claiming those factors in its brief, why the government misunderstood the whole concept of sentencing entrapment. Counsel, the argument in sentencing entrapment is basically that but for the government's bad actions or setup, I would have done something much smaller. So what does the record show here about what is the much smaller thing that these folks would have conspired to do? The record shows that the ATF sent out a CI to find somebody who wanted to commit stash house robberies. Right. And they stated a certain amount. I forget now what it is, 22 to so many kilos. 22 to 39. And that was stated from the outset, and it never changed. So is your argument that these are folks who would only have really wanted to steal 10 kilos, but it's, you know, they were pushed into stealing more? And if so, where does that appear in the record? Actually, no, Your Honor. My point is that that concept of predisposition to steal a lesser amount of drugs is too narrow. Well, then what is sentencing entrapment? I thought it was the concept that you are being punished for more than what you were really wanting to do. And the only reason you're being punished for more is that the government has pushed you into doing more, so that you want to steal $10, but the government induces you to actually steal 100, where you would have not done so otherwise. Yes. So what was the lesser amount here? I'm glad you brought that up. The test for sentencing entrapment is when a person is predisposed to commit a lesser crime, but is entrapped into committing a greater crime. Okay. I've asked you, what is the lesser crime? The lesser crime is robbery. What this case comes down to is none of these defendants were predisposed to traffic large amounts of cocaine. The ATF sets up these fictitious stash house robberies and, well, sets them up so that these people can be charged with conspiracy to commit drug trafficking when none of them would have done so. I mean, sure, they would have robbed a house full of maybe cash or jewelry or anything else. When you look at their criminal histories, there's nothing of this magnitude. And the fact that the government — Maybe not magnitude, but what about type? Had they not been involved in drug — Some of them have. Possession of marijuana for Timmons, for example, possession of marijuana for Mahone. My guy, Black, didn't have any drugs. I mean, these are low-level, small-time criminals we're dealing with here. They are uneducated, young African Americans, very spotty employment history. The government approached them out of their desperation, not out of the fact that these are guys that commit stash house robberies. And the fact that the government was able to manipulate their sentencing to the point where they are going under the level for a mandatory minimum on trafficking drugs when really all they were out for was a quick profit for robbing a house. Thank you, counsel. We will give you a couple of minutes for rebuttal. Thank you. Because we have a lot of issues and a lot of defendants and some challenging points for us to deal with. We'll hear from the government. May it please the Court, my name is Carla Hodes-Delore, representing the United States. I'll just follow and go in order. First, the district court correctly denied the defendant's motion to dismiss the motion for outrageous government conduct. This court had set forth five factors in the Bonanno test in analyzing whether the government engaged in outrageous government conduct and the government has satisfied all five of those tests. The defendants were already involved in a continuing series of similar crimes and the government had reason to believe this based on statements that were made. How did the government know? When it recruited them, how did it know that? When it recruited them, what happened is at the first meeting when Simpson met with Agent Zayas, he had told Agent Zayas that he had goons who were ready to commit this robbery and his goons wanted to know whether they should murder the people or just rob them. Did he say he was doing such robberies at the time? The Simpson, he... He said... I'm sorry, Black told Agent Zayas when Black met... I thought you said it was Simpson. I first started with Simpson to show that Simpson said he had goons who were ready to commit this type of crime. Then at the next meeting when Black appeared and met with Agent Zayas for the first time, Black told Agent Zayas that he could get firearms and when Zayas asked him, do you know what you're doing, Black said, I've got this shit down to a science and he told Zayas, I've done this before. So those comments led the government to believe... The fact that he had done it before didn't prove he was ready to do it again, did it? Yes, he... When you look at all the comments together, when Simpson first met Zayas and he said he had his goons and they were ready to do this, at that meeting four times he said he and his goons were ready to ride, they were ready to commit this. And then Black said, we've got this down to a science, we need a plan, we need to do it... I've done this a few times. Then Alexander comes into the picture with the next meeting and Alexander talks about, again, more planning and organization. So the government is under the belief the entire time with all of these meetings that they've been involved with this and they've done this type of crime before. Well, I think the fact that they've committed crime in the past is not exactly proof that they're going to do it again. Well, the fact that when it led the government to believe that they had been engaging in a series of this and the fact that their statements that we're ready to ride, we're ready to do this, let's get this going, I'm paraphrasing, but that gave the government reason to believe they've done it in the past and they're ready to do it again. And as the district court found, the fact that they were able to organize and get together and have all the weapons and organize so quickly showed that they had the capacity to, in fact, carry out this stash house robbery. I want to ask you, I know that at least opposing counsel view these as completely analytically distinct, but they are related in my mind, and that is the sentencing entrapment piece of this. One has the impression watching these videos and reading the transcripts that they would have said yes to pretty much anything that was presented to them. So maybe, I don't know which way that cuts. If the inducement had been, we know there's some antiques in this house that could be worth a lot on the black market, one kind of sentence would have resulted. And X number of kilos of drugs, there's another kind of punishment involved. How do we decide whether the selection of the fake robbery is appropriate or inappropriate? Well, looking at, the district court found that none of the defendants had proved a sentencing entrapment. And the district court found that the defendants were predisposed to commit these offenses and they had capacity to commit them. The district court found that the defendants agreed to participate in the... Well, they clearly did, but that's what I'm asking you. They clearly would have agreed to anything. If they said it was 1,000 kilos, they probably would have agreed to it and just brought more weapons. But I guess I'm just concerned about how we decide whether it's okay or maybe if they really are predisposed to do anything, then maybe the government can pick. I guess I'm just trying to wrestle with that concept. Well, the thing is, is Agent Zayas, he presented, he testified that he specifically presented this scenario because they wanted to target individuals who are engaged in this type of activity. And Simpson stated, testified that he had approached Alexander about this and he also had approached Mack, and then Mack backed out of it. So not everyone was predisposed, but these defendants were engaged in wanting to do this crime. And as the district court found, the district court found that even if this was a lower amount of drugs, that the defendants still would have done it. Now, whether they would have done it if it was a super small amount, maybe it wouldn't have been worth a while, that's not known. But the district court found that they were willing and able to do it for the amount of drugs. And in fact, the district court made clear when analyzing the sentence entrapment, the district court said, look, I agree with the probation officer and the base offense level is 34. The district court also made clear that the government did not engage in sentence entrapment. Then what happened is in sentencing, to be fair, the district court said, I will reduce the base offense level by two levels, which is what the government had recommended. Then when it came time to sentence the defendants, the court even went below that base offense level of 32 and sentenced the defendants as if there was sentencing entrapment. So for example, Alexander, based on the court's findings, his guidelines range was 128 to 210 months. But the district court ended up sentencing him to 132 months, which was an equivalent of having 2 to 3.5 kilograms of coke. With Black, his guidelines range was 210 to 262 months. The court went below that and sentenced him to 138 months. And this is all on the conspiracy count. And then with Mahon, his guidelines range was 188 months to 235 months. The court sentenced him to 120 months. And Timmons, the guidelines range was 262 to 327 months. And the court sentenced him to 130 months. So the court found no one had proved in sentencing entrapment, but the court gave him the benefit of the doubt, reduced the base offense level by two levels, and then even sentenced him even further below that level in giving them that benefit. I wanted to ask you a question that is kind of basic and not exactly raised by the defendants, but they're convicted of conspiracy to possess and distribute cocaine. Now, the drug itself was in the control of the government, was it not? There was no actual cocaine. Correct. So isn't it an imaginary crime? What is the crime in agreeing to possess and distribute something you have no way of acquiring? Well, the crime was the conspiracy, the conspiracy to do this. And the fact that it was... Doesn't the conspiracy have to have some basis in reality? If the conspiracy was to rob the Wizard of Oz, you could show that the Wizard of Oz was not an imaginary person. Now, here, the cocaine is imaginary. That is correct, but this court has previously held, and I don't know if I'm getting the exact case right, but this court has previously held similar convictions of conspiracies to rob fictitious stash houses, specifically in United States v. Williams and United States v. Rodriguez. This court has upheld those convictions even though there was no actual stash house and no actual drugs involved. Okay, you've got a precedence, but I'm asking you to explain the rationality of that. I would honestly have to go back and reread those cases to find out exactly the court's rationale, but the crime, as the court found here, was not the actual robbery but the conspiracy to do it. I understand that, but it's a conspiracy to commit a crime that is impossible. So... It's only... The only reason it was, quote, impossible in this case was because the government chose to err on the safe side and not have real drugs in a real stash house. That's the way it was, though. The government had the cocaine. They could not have obtained it. It was just... It's an imaginary crime in my book. Well, the government specifically, as Agent Zayas testified, the government specifically chose to make this fictitious because they realized the danger. Right. Everyone would be more in danger. I'm not criticizing. All I'm saying is you don't have a case. I respectfully disagree with that. Well, you've got to check and tell me how those were real. As I've read the cases, they've always involved people already engaged in doing something bad that the government then tries to... But here the government creates the crime. And the reality is there was no crime. The government... I can understand your question, but I respectfully disagree in that this court has upheld these fictitious stash houses before and the conspiracy convictions that have arisen from them. And the court... I just lost my train of thought. Dang it. I'm sorry. I lost my train of thought. Well, I know I was on a case, and I can't remember what it was, but I remember we... I think Judge Tashima and I were on a case where we expressed concern about sentencing entrapment since we were diverted... we have diverted into sentencing entrapment to some extent. And I take Judge Noonan's point, and I can't remember whether that was a fictitious setup as well. We were troubled by the government's ability to manipulate the parameters of the crime and create something that might be excessive in relation to what these folks were doing. So along the same line that has been pursued... I know I'm out of sequence by the way counsel presented it, but counsel said that these guys were low-level guys, uneducated, and so on and so forth, and that basically what they did was they were lured into a scenario that they just jumped on, and the government could have picked these guys up to rob a candy store for that matter. You said, well, they were looking for people who had a history in these violent robberies and with violent consequences in some cases. And I'm concerned that just by trolling the way they did, they didn't have any suspicion about these guys until they came to a bar. The CIA, as far as I know, simply went to a low-class neighborhood, went to a seedy bar or whatever, and trolled. So both the setup for this, as Judge Noonan is saying, a fictitious crime with a drug level set way up. I take your point that Judge Morgana apparently was sensitive to that. Maybe the government was too and tried to mitigate it by the downward departures and reductions. But just looking at this whole setup, explain why this is a scenario that we should explicitly endorse and create a precedent that says this is the kind of government investigative activity that's quite okay. Well, as I stated earlier, this Court has previously upheld in United States v. Williams and United States v. Rodriguez the use of fictitious stash houses to get these type of defendants. That may be true. Let's take that. What about picking these guys out without any prior knowledge about them? And I do not have the case in my notes here. I do know it is in our brief where reasonable suspicion is not required before the agents engage in an undercover operation because it's impossible for law enforcement to know the identity of every person who's going to be committing this type of crime. And that's where this is where the government has satisfied the outrageous government conduct test, is that the government believed, based on the defendant's statements to Agent Zayas, that these people were engaged in this type of behavior. And so the fact that they might have been bragging and really hadn't done it, that doesn't matter for the government is what you're saying? Right. Exactly. The fact that they may have been bragging and embellishing their past crimes, it still gave the government a reasonable belief that these people are involved in this type of activity based on their statements and based on everything that happened. He presented the opportunity to the defendants. They did not have to take it as evidenced by the fact that this other character, Mack, did not take the opportunity. He backed out. The government presented it, and the defendants could have walked away, but they didn't. Instead, they got together and they conspired, and Alexander, after meeting with Agent Zayas, he and all the co-defendants had a meeting at his house, and that's where Alexander organized the plan. He assigned the roles to the individuals. He assigned that there would be Alexander, Black, Mahon, and Marsh would be the four gunmen that go in the house, and Timmons and Holden would be the two drivers. And that's what Simpson testified to as to what happened at the meeting, and sure enough, that's exactly what happened the next day when everyone met. Holden was a driver, and Mahon and Marsh were in his car. Timmons was the driver of the other car, which was his own car, and Alexander and Black were in the car, and there were four guns found in that car. So what Simpson testified to at the meeting is exactly what took place the next day at the final meeting before they went to the storage unit. I know we've gone kind of out of order. If there's any other questions that the Court has for me, I'd be happy to address them. There's some concern about the Mahon and Timmons being sort of at the low end of the participation scale, if even involved, so could you address that? Sure. There is clearly sufficient evidence to support both the convictions for Mr. Mahon and Timmons. I'll start with Mr. Timmons first. Timmons was present at the meeting on July 26th when Alexander assigned the rules to everyone and told Timmons he would be a driver. The next day, Timmons showed up driving his own car. In his car were the two most culpable defendants, Alexander and Black, and the four guns were in the car. Beyond that, when Agent Zayas approached their car, he said, hey, this guy, referring to Timmons, he's new, and Alexander said, he's my driver. Zayas wanted to make sure he knew what was going on and said, he asked Timmons, does he know that there's going to be 50 keys of coke in there and that we're going to split it evenly? And the response was, yeah, man. Zayas then said, I just want to make sure he, again referring to Timmons, understands. Just don't put a bullet in my head, okay? And someone responded, no, he's cool. Zayas then said, it's all good coke, and he said, what I did was I rented a storage house. I want you to, after the rip, I want you to put my drugs in the storage house. He then said, it's right down here, follow me, because the guy is going to call soon. They then proceeded to follow Zayas to the storage facility, and at the storage facility, Mahon and Marsh got out of the white car, and that's when the flashbang devices went off, and everyone was arrested. I'll quickly go through Mahon. I only have a few 40 seconds left. With Mahon, Mahon was present at three of the meetings, and where, again, the Sash House robbery was organized and planned. Mahon showed up the final day in the white car, and, in fact, Mahon, if I'm remembering correctly, had the receipt for the white rental car in his pocket, and it was Mahon's sister who had rented the car. Then they, again, listened to Zayas, they then follow Agent Zayas to the storage facility, and Mahon and Marsh get out of the car, and Zayas shows them the storage unit, asks if everything is cool, and that's when the flashbang devices went off. I see that I'm out of time. Your flashbang device. We understand your arguments. I have one question, though, because I've got Williams that I was looking at as well. In Williams, it's somewhat different because they were dealing with Williams where the agent approach under the five-factor test, the agent approach persons already contemplating are engaged in criminal activity, and in Williams, they were preparing to rob a bank, and then the government said, well, we've got a better deal, do the Sash House. So they were contemplating a real crime, and it was only for safety purposes that the government substituted, which we did endorse. So that's not quite this case, is it? Well, it's still the case in that the agent still presented a fictional Sash House with no real drugs and no real money to be robbed. It's similar in that essence. They substituted for a real bank with real money. But the fact is, even though in Williams he was prepared to rob a real bank, the government still said, I'm going to give you this opportunity here, and that was all fictitious. And even though we didn't have the case of these defendants planning to rob a bank in this case, based on their statements to Agent Zayas, he was under the reasonable belief that these people had committed this crime by the fact that they had talked about having a crew, we're ready to go, we're ready to do this. And so he was under the belief that they were engaged in this type of crime. And for those reasons, we ask you to a little bit more. The fact that they had done it, how did that show that they were ready to do it now? They had done it when ‑‑ I just want to make sure I get my defendant correct so I don't get my defendants mixed up. When ‑‑ No, no, I'm just saying, why is that true? I had committed a crime. That means I'm ready to commit the same crime? Why does it mean that? It doesn't necessarily mean that, but what happened is, based on what Simpson had told Agent Zayas when he first met him, Zayas ‑‑ Simpson listened to Zayas and said, I've got a crew, I've got goons, we want to know, are we going to murder them or just rob them? And then he stated four times in that first meeting with him that he and his goons were ready to ride, we're ready to do this again. So just the fact that they hadn't done it in the past didn't necessarily mean that they were going to do it again. He presented them the opportunity, and they said, yes, we're ready to go, and they did every step to follow through except the actual robbery, which they stopped for before. Thank you, counsel. This is a complicated case, and we've used a lot of time with questions, and so you may rebut for ‑‑ start with two minutes. I don't know who was going to do that. Ms. Hovland, I think, had her. Okay. Mr. McPherson. Your Honor, you could be a passenger in a car, knowing that there's drugs in the car, knowing that they're being transported for distribution. That is not enough. That's the Tron case at page 24 of my brief in the chart. It's a decision by this Court in 2009. You can be the driver of a car dealing ‑‑ with drug‑dealing conspirators, you trail an undercover agent, you suspect that he's spying on you, and you're not a credible witness at trial, and that's not enough. And that's the Klogesi case decided by this Court in 1977. So, especially as to Mahon, at most he was a ‑‑ he was at meetings, and most he knows the whole plan. I'll give you that. He knows the whole ‑‑ let's give you the whole plan. He knows it. But he doesn't participate. You can sit in a car, knowing your friends are robbing a bank, and you're just sitting there along for the ride, and you're not involved in the bank robbery. You're not guilty. There's not sufficient evidence. The evidence has to be that you participated somehow. If there's any questions, I'll be glad to field them, Your Honor. I don't believe so. Thank you, Your Honor. There is still a little bit of time. Does anybody else want a minute? I would like to respond to two points from the Court and one point from the Attorney General in regard to the sentencing entrapment claim. The first is this Court basically said, can the government create a crime out of whole cloth? And if so, how do you decide which fictitious scenario is okay? If the defendants, like in this case, appear to be predisposed to commit any crime, can the government just pick whatever crime they want? The answer to that is no. And the answer ‑‑ What's the limiting principle? What crime do they get to pick? Well, you look at the ambition and the means of the defendants you're dealing with, and in this case it would be ‑‑ Well, be careful because their ambition was to do this crime. Right. So, but because it seems to me that if they were willing to do any crime, including this one, what is the limiting principle that says no, the government can only limit it to 10 kilos or 5 kilos or whatever? The governing principle is that sentencing entrapment is supposed to prevent the government from maximizing sentences. And the punishment should fit the offender and not just the crime. Well, didn't the district court, according to counsel for the government, the district court scaled it back just for that purpose? That wasn't enough. What's happening now is that the judicial function of discretion in sentencing is being pushed down the chain. And it's all the way down to the police now. The police can start with such an incredibly high punitive crime like this, where they have X number of kilos for mandatory minimums, that the government can come in and look like a nice guy and say, yeah, let's bring it down two levels. It would have had to come down five levels to get down to, say, for example, a robbery scenario, like the course was mentioning, if they were going to steal antiques or money or jewelry or whatever. The government, all they keep doing is ratcheting up and up and up to get to where they want to be. And that's the whole point of sentencing entrapment is not to let the government do that. Thank you. You have well exceeded your time. Okay. Well, then, I just, may I say one more thing? Yes. Because this is such an emerging area of law, every case that gets appealed and affirmed lets the government learn what it can and cannot do. I think this Court has an opportunity to tell the government what they can and cannot do in these fictitious stash house cases and either do that by reversing on this sentencing entrapment claim or at least remanding to the district court with directions on how to assess such a claim. Because here the district court was assessing it under the typical sentencing entrapment scenario, which was drug sales and buys, where he was making the defendants prove that they were predisposed to do lesser amount of drugs. That's easy for a drug dealer to say, oh, I usually sell X and you want me to sell Y. How does a person who has no proclivity to do drug trafficking prove that he's predisposed to do less drug trafficking? It doesn't make any sense. And I think the Court needs to look at that. Thank you, counsel. Thank you. The case just argued is submitted and we appreciate the arguments of all counsel. It's a very challenging matter. And we will be adjourned for this session. Thank you.
judges: Noonan, Graber, Fisher